**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Criminal No. 24-CR-39 (APM)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **BRANDON TYRIQ WHITE,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION**
**TO EXCLUDE EXPERT AND FACT WITNESS TESTIMONY**

The United States of America, through undersigned counsel, respectfully files this Opposition to the defendant's motion to exclude expert and fact witness testimony, ECF No. 15. In his motion, the defendant raises various objections to the government's October 11, 2024, expert notice, to include 1) the absence of a case-specific opinion with respect to certain experts; 2) the absence of a basis for opinions for certain experts; and 3) the government's delay in providing materials with respect to certain experts. *See id*. In response, the defendant asks this Court to exclude these experts from testifying in his upcoming trial. *Id*. at 4.

The defendant's motion fails for several reasons. First, the government anticipates supplementing its expert disclosures for the SANE, strangulation, and CAST experts with case-specific opinions. In the meantime, the defendant is on notice of the types of expert evidence the government intends to introduce, the identity and/or professional background of these witnesses,[1] and the bases for their opinions. The defendant has sufficient time to hire his own experts to review the materials in this case and prepare for trial. Second, to the extent that the government's initial

---

[1]     The defendant notes, at 13, that the government has not provided the name of its CAST expert. While the government anticipates that its CAST expert will be FBI Agent Benjamin Fulp, who has been qualified as a CAST expert in numerous cases, the assignment will not be final until the records are received.

disclosure and anticipated supplemental filings are considered delayed notice, the proper remedy is a continuance, not exclusion, because there was no bad faith by the government. Finally, the completed expert disclosures (DNA experts Nicole Hopkins and Brett King and Domestic Violence expert Amy Bonomi) are sufficient under Rule 16 and the testimony offered by these witnesses is relevant and highly probative to the facts at issue. In support of its motion, the government relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this matter.

## I.      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The defendant was charged by Indictment on January 23, 2024 with Kidnapping, in violation of 18 U.S.C. § 1201(a)(1), two counts of First Degree Sexual Abuse While Armed, in violation of 22 D.C. Code §§ 3002(a)(1), 3002(a)(2), 3020(a)(6), 4502 (2001 ed.); Aggravated Assault While Armed, in violation of 22 D.C. Code §§ 404.01, 4502 (2001 ed.); three counts of Possession of a Firearm During a Crime of Violence or Dangerous Offense, in violation of 22 D.C. Code § 4504(b) (2001 ed.); Strangulation, in violation of 22 D.C. Code § 404.04(a); and Carrying a Pistol Without a License, in violation of 22 D.C. Code §§ 4504(a)(1). These charges all relate to the violent kidnapping, rape, and physical assault of the defendant's former intimate partner, M.B. The defendant appeared before this Court on February 16, 2024, for an initial status conference. On July 22, 2024, the defendant rejected the government's plea offer and the Court set a trial date of January 13, 2025.

### A.      The Scheduling Order

In anticipation of trial, the Court issued a scheduling order, where, relevant to this filing, it ordered the government to 1) make expert disclosures pursuant to Rule 16(a)(1)(G) by October 11, 2024; 2) identify the evidence it will seek to introduce under Federal Rule of Evidence 404(b) on

or before October 11, 2024, and 3) file motions *in limine* on or before October 25, 2024, except as otherwise noted in the Order. *See* ECF No. 9, Pretrial Order. Additionally, the Court ordered that the government "endeavor to make grand jury and Jencks Act disclosures as to each witness it expects to call in its case-in-chief on or before December 27, 2024." *Id.*

    **B.**    **Discovery**

    The government provided discovery over the course of five productions on the following dates: 1) February 15, 2024; 2) March 29, 2024; 3) October 21, 2024, 4) October 25, 2024; and 5) October 28, 2024.[2] The overwhelming bulk of discovery was produced prior to March 29, 2024, to include the FBI file as of that date, and material from the Metropolitan, Prince George's County, and Charles County Police Departments. These productions also included records of the victim's sexual assault examination from Washington Hospital Center, video surveillance, and police body worn camera footage.

    Notably, the October 21, 2024, production included all items previously produced in Productions 1 and 2, as well as additional items, to include the updated FBI file documenting investigative steps taken since the last production, and materials specifically requested by the defense. The government reproduced the prior productions in response to an October 18, 2024, email from the defense, where it notified the government that it had not received certain items, including search warrant affidavits, the initial DNA report from Bode Technology, and M.B.'s medical records. Undersigned counsel was unaware that the defense did not have M.B.'s medical records, as government records indicated that these items were produced to the defense as of March 29, 2024, as an attachment to the FBI case file serials. While the government accepts the

---

[2]    On October 28, 2024, the defense notified the government that it had not received the recording of M.B.'s interview with PG County detectives. The government provided the recording later that day.

defendant's representations that he did not receive these records, any nondisclosure was inadvertent and certainly not the product of intentional withholding. In any event, in response to learning the records were not produced, the government reproduced its entire file with a log identifying new items not previously disclosed.

With trial approaching, the government has continued to build and strengthen its case through investigatory steps. It has conducted additional witness interviews and obtained a search warrant for cellular location information.[3] It has also contacted various witnesses and agencies to ensure they remain available to testify at trial. As part of that process, case prosecutors are verifying that we have in our direct possession, all material that could be considered *Jencks* or is otherwise discoverable. Any additional items obtained because of these efforts have been, and will continue to be, promptly produced to the defense.[4] Moreover, any additional interviews or investigative steps taken by the agents assigned to this case will result in additional FBI reports, which will also be produced to the defense on an ongoing basis. There was no bad faith or intentional delay by the government.

---

[3]     The government applied for a warrant for cellular location information for phone numbers associated with the defendant and M.B., the records of which had been preserved early in the investigation. This warrant was authorized by the Honorable Zia M. Faruqui on October 7, 2024. As of the time of this writing, the government has received data back from M.B.'s cellular provider, but not the defendant's. Upon receipt of the data, the information will be provided to a member of the FBI's Cellular Analysis Survey Team (CAST), who will plot the data on a map and produce a report. As this information is not yet available, the government filed a placeholder notice, which it intends to supplement as soon as the data is received and the report complete.

[4]     For example, in preparing for trial, the government noticed that it did not have complete 911 records from Prince George's County, and instead only possessed MPD's records. The PG County records were requested, and disclosed to defense the day they were received. The same holds true for the accompanying PG County Fire Department records from their treatment of M.B. on scene.

## II.    ARGUMENT

The defendant asks this Court to exclude all the government's experts and certain fact witnesses due to alleged violations of Rule 16. Specifically, with respect to the DNA experts, the defense argues that they should be excluded because the government did not provide full discovery from Bode Technology by the October 11, 2024, notice deadline. The government had not received full discovery from Bode by October 11. It was received on October 25, and produced to the defense the same day – roughly 80 days prior to trial. This Court should not exclude probative evidence under these circumstances. As to the SANE and strangulation experts, the defense argues they should be excluded because their notices are insufficient and incomplete as of the notice deadline. Each expert is expected to issue a case-specific opinion upon completion of their review of material in the case, and sufficiently in advance of trial for the defense to respond. And, of course, the government would not oppose any filings by the defense to address objections to the supplemental notices. While the Court has discretion to exclude the experts due to the delay in their expert disclosures, this remedy is extreme and inappropriate under the circumstances. The proper remedy, if any, is a continuance, not exclusion.

The defendant further argues that the SANE, strangulation, and Domestic Violence expert notices fail to provide the bases for their opinions. This assertion is inaccurate, as the notices establish that each expert is basing her opinion on her extensive training, experience, and education, as discussed further below. Further, the defendant contends that testimony from the strangulation expert is irrelevant. To the contrary, it directly bears on elements of charged offenses, which the government must prove at trial.

A.      **Applicable Law**

i.  **The Admissibility of Expert Testimony**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, four criteria must be met in order for the testimony to be admitted: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The trial judge serves as a gatekeeper to the admissibility of expert testimony.

Rule 702 was amended in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Pursuant to *Daubert,* the trial court must undertake a "two-prong analysis that centers on evidentiary admissibility and relevancy: the district court must determine first whether the expert's testimony is based on 'scientific knowledge;' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert,* 509 U.S. at 592). In *Daubert*, the Supreme Court provided several non-exclusive, non-dispositive factors for trial courts to consider when assessing the reliability of expert testimony. These factors include whether an expert's technique or theory (1) can be or has been tested; (2) has been subject to peer review and publication; (3) has a known or potential error rate; (4) has maintained standards controlling the technique's operation; and (5) has general acceptance in a relevant scientific community. *Daubert*, 509 U.S. at 593-94. Although *Daubert* listed these factors as examples of things a trial court may consider in assessing scientific validity, the Court emphasized that the inquiry is a "flexible one." *Daubert*, 509 U.S. at 593-95. While

*Daubert* focused on scientific evidence, the standard also applies to proffers of "technical, or other specialized knowledge." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999).

Since *Daubert*, the Supreme Court has cautioned that the sample factors listed in *Daubert* "do not constitute a definitive checklist or test." *Kumho Tire Co.*, 526 U.S. at 150. Rather, "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id* at 141. The Court has emphasized that district courts are granted "considerable leeway" in determining how to assess reliability. *Id.* at 152. "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [their] testimony." *Id.* at 150 (internal quotations omitted). "[W]hether *Daubert*'s specific factors are, or are not, a reasonable measure of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153; *see also Ambrosini*, 101 F.3d at 139 (finding that "additional indicia of reliability" beyond the *Daubert* factors supported an expert witness's testimony); *SEC v. Johnson*, 525 F. Supp. 2d 66, 68 (D.D.C. 2007) (noting that "the factors discussed in *Daubert* were not necessarily applicable in every case, dispositive, or exhaustive"); *Groobert v. President & Dirs. Of Georgetown Coll.*, 219 F. Supp. 2d 1, 7 (D.D.C. 2002) (noting that "the standard under . . . 702 is a liberal and 'flexible' one, and that personal experience can be a reliable and valid basis for expert testimony," and "[t]his is particularly true with non-scientific testimony") (citing *Kuhmo Tire Co.¸* 526 U.S. at 149).

*Daubert* provides guidelines for a trial judge in determining whether the proposed expert testimony is sufficiently reliable. "*Daubert* lowered the threshold for admissibility of scientific evidence, envisioning a 'limited gatekeeper role' for trial judges." *SEC v. Johnson*, 525 F. Supp. 2d at 68. The Rules Advisory Committee observed: "A review of the caselaw after *Daubert* shows

that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. In exercising its gatekeeping function, courts must keep in mind the Supreme Court's admonition that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. *Daubert* cautions against being "overly pessimistic about the capabilities of the jury and of the adversary system generally." *Id.* at 596.

### ii. Expert Disclosure Requirements

Federal Rule of Criminal Procedure 16(a)(1)(G)(iii) sets forth what the government must disclose to the defendant when it intends to call an expert witness:

1. A complete statement of all opinions that the government will elicit from the witness in its case-in-chief;

2. The bases and reasons for them;

3. The witness's qualifications, including a list of all publications authorized in the previous 10 years; and

4. A list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

With respect to the first required disclosure, a "complete statement of all opinions" the expert will provide, the Rules make clear that this "does not require a verbatim recitation of the testimony the expert will give at trial." FED. R. CRIM. P. 16 adv. comm. note (2022 amend.). The notice requirement is intended to "facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witness and secure opposing expert testimony if needed." FED. R. CRIM. P. 16 adv. comm. note (2022 amend.). Because the purpose of this provision is to provide *notice* to a party, Rule 16 (a)(1)(G)(iv) – Information Previously Disclosed, contemplates that an expert notice may refer to reports and accompanying documents previously disclosed to a party.

FED. R. CRIM. P. 16(a)(1)(G)(iv). Specifically, the relevant advisory committee notes to Rule 16 states:

> Items (a)(1)(G)(iv) and (b)(1)(C)(iv) also recognize that, in some situations, information that a party must disclose about opinions and the bases and reasons for those opinions may have been provided previously in a report (including accompanying documents) of an examination or test under subparagraph (a)(1)(F) or (b)(1)(B). Information previously provided need not be repeated in the expert disclosure, if the expert disclosure clearly identifies the information and the prior report in which it was provided.

FED. R. CRIM. P. 16 adv. comm. note (2022 amend.).

**B.    The Government's Expert Notices**

On October 11, 2024, the government noticed expert testimony in five areas: 1) Forensic DNA Testing and Analysis; 2) Sexual Assault Examination; 3) Strangulation; 4) Domestic Violence and Coercive Control; and 5) Cellular Location Analysis. *See* Gov. Ex. 1 (Government's Expert Disclosure); Gov. Ex. A – G (Attachments to Government's Expert Disclosure (under seal)). The government separately provided notice that it may call as fact witnesses treating providers from Washington Hospital Center and a dentist who treated M.B. following the assault in this case. The status of expert disclosures is as follows:

| Expert | Topic | Status of Expert Disclosure |
|--------|-------|----------------------------|
| Bode DNA Analysts King and Hopkins | DNA | Complete. Notice provided on Oct. 11, 2024; supplemental discovery provided upon receipt on October 25, 2024. |
| Amy Bonomi | Domestic Violence | Complete. |
| Erin Pollitt | Sexual Assault Examination | General notice provided on Oct. 11, 2024, case specific opinion in progress. |
| Beth Weekley | Strangulation | General notice provided on Oct. 11, 2024, case specific opinion in progress. |
| FBI CAST | Cellular Location Analysis | Preliminary notice provided on Oct. 11, 2024; FBI CAST agent is assigned but awaiting search warrant returns from Verizon Wireless.[5] |

---

[5]    The government has been informed that Verizon currently has an approximately 40-day backlog on records production. The government is investigating ways to expedite the return of the

| Expert | Topic | Status of Expert Disclosure |
|---|---|---|
| Dr. Kevin Maloy and Dr. David Gordon | Treated M.B. at Washington Hospital Center | The government will not seek to admit these doctors as experts, nor will it elicit opinion testimony from them. |
| Dr. Dipti Gejji | Dentist who treated M.B. following the assault. | The government will not seek to admit Dr. Gejii as an expert, nor will it elicit opinion testimony from her. |
| Bianca Palmisano | Sexual Assault Nurse Examiner who treated M.B. | The government will not seek to admit Mx. Palmisano as an expert, nor will it elicit opinion testimony from them. |

Each witness will be addressed in turn:

### i. Forensic DNA Testing and Analysis

The government intends to offer expert testimony from Bode Technology DNA Analysts Brett King and Nicole Hopkins. *See* Gov. Ex. 1 at 2. These individuals conducted testing of DNA samples from M.B. and the defendant. By way of background, M.B. was seen at Washington Hospital Center following the sexual and physical assaults committed by the defendant. She was examined by a Sexual Assault Nurse Examiner (SANE) from the District of Columbia Forensic Nurse Examiner's Program ("DCFNE"). During the examination, the following samples were taken from M.B. to be submitted for DNA testing and analysis: 1) vaginal/cervical swabs, 2) oral swabs, 3) lips/lip area swabs, 4) neck swabs, 5) external genitalia swabs, and 6) a known blood sample (collectively, commonly known as a "rape kit"). These samples were sent to Bode Technology, where they were received on January 4, 2024, for possible DNA analysis. On March 5, 2024, Senior DNA Analyst Nicole Hopkins issued a report outlining her findings as to the samples. In short – a male profile was developed from the samples but, at the time of the testing, Bode did not yet have a known sample from the defendant to compare the samples to.

---

material needed for CAST to conduct its analysis and will provide an estimate on completion as soon as possible.

Subsequently, the government obtained a warrant for the defendant's buccal swab, and provided that sample to Bode for testing against the items provided in the rape kit. The defendant's sample was received by Bode on July 25, 2024. On September 24, 2024, Senior DNA Analyst Brett King issued a report outlining his findings. There was "very strong support for inclusion" of the defendant's DNA across the samples. This report received by the government on October 1, 2024, and provided to the defense the same day.[6] Following the completion of testing, the government requested full discovery from Bode. These materials were received on October 25, 2024, and provided to the defense the same day.[7] The defendant does not appear to challenge Ms. Hopkins' or Mr. King's expertise, rather, the objections centered on whether their notices were Rule 16 compliant. Exclusion is not the proper remedy for a brief delay in receiving full discovery from Bode, particularly where the defense was provided with the material as soon as it was received by the government, and approximately 80 days out from trial.

### ii.   Sexual Assault Examination and Treatment

The government intends to offer expert testimony from Erin Pollitt in the field of sexual assault and abuse, sexual assault injuries or the lack thereof, and sexual assault examinations. *See* Gov. Ex. 1 at 5. Separately, the government intends to offer fact witness testimony from Bianca Palmisano, who conducted the examination of M.B. at Washington Hospital Center following the assault. *Id*. at 6. Ms. Pollitt will partially testify as a teaching expert, in that she will explain general

---

[6]    Following disclosure of the DNA report, the government reextended its prior plea offer to the defendant, with an expiration date of October 8, 2024.

[7]    In his filing, the defendant complains that the government "failed to disclose any of the information underlying the opinions of its DNA experts" and "has not provided [him] with the full Body Body laboratory file regarding this case." *See* Def. Mot. at 4, 15. As noted, these materials were provided on October 25, 2025, the same day they were received by the government, and 80 days prior to trial. The experts should not be excluded on this basis.

information relevant to sexual assault examinations, as outlined in her notice. The government intends to supplement her notice with a case specific opinion and will do so when her analysis is complete.

Regarding testimony from Ms. Pollitt and Mx. Palmisano, the defendant lodges three primary complaints: 1) he did not know, prior to the expert notice filing, that the government would seek to call Ms. Pollitt as a witness; 2) the government has not disclosed case-specific opinions it intends to elicit from Ms. Pollitt; and 3) Ms. Pollitt's notice does not provide a sufficient basis for her opinions. *See* ECF No. 15, Def. Mot. at 9. As an initial matter, it is inapposite that the defense did not know Ms. Pollitt would testify prior to the October 11, 2024, deadline. While Mx. Palmisano, not Ms. Pollitt, performed the SANE examination in this case, it is "within the government's discretion" to call separate fact and expert witnesses. *See, e.g*. *United States v. McGee*, 2024 U.S. Dist. LEXIS 9880, *29 (E.D. Okla. Jan. 19, 2024) (SANE examiner and SANE expert testimony not cumulative and "within the Government's discretion" where one would testify as a fact witness and the other an expert). There are no grounds on which to exclude Mx. Palmisano's testimony.

As to Ms. Pollitt, courts commonly accept expert testimony regarding sexual assault examination and treatment and should do so here. Testimony from a SANE expert is critical in a case involving sexual assault, where the average juror does not understand the physical consequences of this sort of violence, and may approach the topic with uninformed biases, prejudices, and misconceptions. A layperson may expect a victim of sexual assault to react in a certain way or have particular injuries. For example, they may believe that a forcible rape would necessarily cause vaginal injury of a certain kind and degree, that sexual assault would not result in vaginal lubrication, or would necessarily result in the recovery of evidence, such as the

perpetrator's DNA. As Ms. Pollitt will explain, however, these are common misconceptions. Indeed, oftentimes there is no vaginal injury where the victim is of child-bearing age and the rape is vaginal by a penis because vaginas are elastic and self-lubricating. Or, as here, where the victim did suffer a linear laceration to her perineum, an expert could explain topics such as what the perineum is, and other components of vaginal anatomy. The notice provided for Ms. Pollitt outlines her testimony with respect to these general matters. However, the government expects her to elicit a case specific opinion, to include whether, based on her review of records and photographs documenting M.B.'s physical condition at the time of her examination, M.B.'s injury to her perineum is consistent with the introduction of a hard, blunt object, such as a penis, and provide the jury with the background knowledge necessary to appropriately weigh that evidence.

Expert testimony from a SANE is standard in nearly every case involving sexual assault where a SANE examination was conducted or where the government seeks to explain the presence or absence of an injury. This sort of testimony is not so unique or unusual that the defendant will have trouble meeting it. And Ms. Pollitt's expert notice sufficiently outlines the bases for her opinions, which are based on "review of the medical forensic record and photographs, other associated documents as provided, current standards of practice, evidence-based research, and her own education and experience in the field of forensic nursing." Gov. Ex. 1 at 6. As to the education and experience that underpins her opinions, she has been a forensic nurse since 2011 and provided care for "hundreds of patients in urban, rural, and telehealth settings, including individuals who experienced physical and sexual violence, elder abuse, human trafficking, and attempted homicide, as well as suspects of crime." Gov. Ex. 1 at 5. Moreover, her curriculum vitae further supports her

qualifications.[8] Courts have found expert notices sufficient where, as here, the notice specifies the topic on which the expert will testify, which are based on the expert's education, background, and training. *McGee*, 2024 U.S. Dist. LEXIS 9880 at *9. Finally, the notice indicates that Ms. Pollitt is currently reviewing documents related to the case in order to render an opinion, which the government will include in a supplemental notice, which is clearly contemplated by Rule 16. *See* FED. R. CRIM. P. 16(a)(1)(vi) ("The government must supplement or correct its disclosures in accordance with (c).").

### iii.  <u>Strangulation</u>

The government intends to elicit expert testimony from Beth Fitzgerald-Weekley regarding asphyxia injuries and strangulation. *See* Gov. Ex. 1 at 6-9. The defendant claims that such evidence "has no relevance to this matter whatsoever." *See* ECF No. 15, Def. Mot. at 11. This inaccurate assertion ignores the government's burden with respect to Counts Six (Aggravated Assault While Armed (AAWA), in violation of 22 D.C. Code §§ 404.01, 4502 (2001 ed.)), Seven (Possession of a Firearm During a Crime of Violence or Dangerous Offense, in violation of 22 D.C. Code § 4504(b)), and Eight (Strangulation, in violation of D.C. Code § 404.04(a)) of the Indictment.[9] To the contrary, expert testimony is critical to meeting the elements of these offenses.

---

[8]    The government will address the Court's options with respect Ms. Pollitt's incomplete notice below.

[9]    The elements of Aggravated Assault are: 1) the defendant caused serious bodily injury to M.B.; 2) the defendant either A) intended to cause serious bodily injury to M.B.; B) knew that serious bodily injury to M.B. would result from his conduct; or C) was aware that his conduct created an extreme risk of serious bodily injury to M.B. and under circumstances which demonstrated an extreme indifference to human life, the defendant engaged in that conduct nonetheless. For offenses committed prior to March 12, 2024, "serious bodily injury" is an injury that involves unconsciousness, extreme physical pain, protracted and obvious disfigurement, protracted loss or impairment of the function of a bodily member, organ or mental faculty or a substantial risk of death. Instruction 4.103, Criminal Jury Instructions for DC

These three counts relate to the portion of the kidnapping and assault where, after transporting M.B. against her will across state lines into the District of Columbia, the defendant strangled M.B. outside of his grandmother's house when M.B. attempted to flee the location.[10] To prove the element of "serious bodily injury" in connection with the aggravated assault, the government alleges that the defendant applied pressure to M.B.'s neck, thereby causing "serious bodily injury" by creating a "substantial risk of death." Ms. Weekley's testimony will allow the jury to assess whether the injuries M.B. suffered in fact rise to that level. *Compare Headspeth v. United States*, 285 A.3d 1236, 1245 (D.C. 2022) (evidence sufficient to support the conviction for aggravated assault while armed on the ground that the victim endured "serious bodily injuries" "due to the substantial risk of death his injuries posed" where expert testimony established that the victim faced a substantial risk of death), *with Bolanos v. United States*, 938 A.2d 672, 679 (D.C. 2007) (evidence insufficient to support a finding that the victim faced a substantial risk of death where, *inter alia*, there "was no expert testimony presented regarding the effects of the knife wounds, or whether these types of wounds could be considered life-threatening"); *see also United States v. Campus*, 2022 U.S. Dist. LEXIS 155728, *16 (N.D. Ohio Aug. 30, 2022) (permitting expert testimony as to "strangulation, its side effects, and risks of obstetric complications" as helpful for the jury in determining whether the defendant acted recklessly).

Much like with the SANE expert, the average juror is unlikely to understand the risk associated with strangulation injuries and may inaccurately conclude that the lack of or limited visible injury from a strangulation means that the strangulation was not serious. As Ms. Weekley

---

[10]    The defendant separately applied pressure to M.B.'s neck during the vaginal rape which occurred inside of the defendant's grandmother's house. Neither Aggravated Assault nor Strangulation are charged for this incident.

will explain, and as outlined in her notice, this could not be farther from the truth. Ms. Weekley will testify to the consequences of strangulation to overall functioning, and the risk of brain injury. Moreover, she will explain how strangulation can cause death in mere minutes with continued pressure. As outlined in the SANE report, M.B. suffered injuries to include light headedness/dizziness, confusion, difficulty forming words, nausea, difficulty breathing, headache, neck soreness, visible neck injuries, and petechiae to the mouth and throat. Ms. Weekley's testimony will help the jury to understand these injuries, what can cause them, and their risk to a patient's health. Further, Ms. Weekley's testimony will help the jury assess whether the injuries M.B. sustained are consistent with strangulation. Thus, Ms. Weekley's testimony "will help the trier of fact to understand the evidence or determine a fact in issue." FED. R. EVID. 702. The notice provided for Ms. Weekley outlines her testimony with respect to these general matters. However, the government expects her to elicit a case specific opinion upon review of M.B.'s specific injuries, which will bear directly on the government's proof as to the assault charged in Count 6.[11]

### iv.  Domestic Violence and Coercive Control

The government intends to elicit testimony from Dr. Amy Bonomi in the field of intimate partner violence and coercive control. Testimony from "teaching experts" like Dr. Bonomi is generally accepted in this jurisdiction. *See United States v. Anderson*, 851 F.2d 384 (D.C. Cir. 1988) (holding that the trial court properly allowed expert testimony about the dynamics of commercial sex trafficking); *see also United States v. Eiland*, 738 F.3d 338, 351-352 (D.C. Cir. 2013) (the trial court properly admitted expert testimony regarding the general operations of narcotics dealers). Indeed, Dr. Bonomi's testimony is comparable to expert testimony this Court

---

[11] The government will address the Court's options with respect to the timing of Ms. Weekley's notice below in Section III.

permitted in both *United States v. Terrell Armstead*, 19-CR-369 (APM) and *United States v. Green-Remache*, 20-CR-124 (APM). In those cases, this Court permitted substantially similar expert testimony from clinical psychologist Dr. Chitra Raghavan. Dr. Raghavan testified as an expert witness in commercial sexual exploitation, the dynamics of sex trafficking, traumatic bonding and coercive control, and victim behavior that may seem paradoxical or incongruous to the average juror in *Armstead*, and on the theory, research, and frameworks used to understand domestic violence in *Green-Remache*. As in those cases, here, Dr. Bonomi's testimony will help the jury better understand the dynamics of domestic violence, to include the victim's seemingly inconsistent actions, including staying with her abuser, failure to report earlier incidents of domestic violence, and maintaining contact with her abuser and his family following his arrest.

This sort of testimony is necessary because the complexity of a domestic violence relationship is beyond the understanding of the average juror. *See, e.g. State v. Townsend*, 186 N.J. 473, 491 (2006) ("We have no doubt that the ramifications of a battering relationship are beyond the ken of the average juror"); *Alvarado v. State*, 257 Ga. App. 746, 748 (2002) ("[E]xpert testimony is admissible to explain the behavior of a domestic violence victim who does not report abuse or leave the abuser."). Accordingly, courts have consistently found this sort of testimony relevant and helpful to the jury's understanding of why domestic violence victims behave the way they do. Without this sort of background, the average juror might incorrectly conclude that a woman who has not ended a violent relationship, or who minimizes what happened, or fails to report abuse, was lying or exaggerating the abuse.

Notably, the Sixth Circuit affirmed the admission of expert testimony by Dr. Bonomi in a comparable case, where the defendant argued that "her reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, and lack of scientific testing, disqualif[ied]

her opinion." *See United States v. Lavictor*, 848 F.3d 428, 443 (6th Cir. 2017). There, however, the court found Dr. Bonomi's methodology reliable, citing her "voluminous publication history" in support. *Id*. Other courts, too, have admitted this sort of expert testimony. *Id*. (*citing United States v. Young*, 316 F.3d 649, 657 (7th Cir. 2002) (finding that it was not an abuse of discretion to admit testimony by an expert to explain a victim's recantation); *United States v. Alzanki*, 54 F.3d 994, 1009 (1st Cir. 1995) (noting that testimony concerning abuse in relationships was highly material, somewhat technical, and beyond the realm of acquired knowledge normally possessed by lay jurors); *Arcoren v. United States*, 929 F.2d 1235, 1241 (8th Cir. 1991) (a "jury naturally would be puzzled at the complete about-face made, and would have great difficulty in determining which version of testimony it should believe . . . [and] if there was some explanation for [the] changed statements, such explanation would aid the jury in deciding which statements were credible."). Thus, this sort of testimony meets Rule 702's relevance threshold.

As the Sixth Circuit observed in *Lavictor*, courts "have consistently allowed expert witnesses to testify concerning domestic violence even in circumstances where the research is not supported by exhaustive statistical evidence." *Id*. at 444 (*citing United States v. Simmons*, 470 F.3d 1115, 1122 (5th Cir. 2006) (finding an expert's testimony reliable concerning the behavior of rape victims even though the research lacked "empirical validity and ascertainability of an error rate"); *Beauchamp v. City of Noblesville*, 320 F.3d 733, 745 (7th Cir. 2003) (expert's citing anecdotal rape research to explain victim's "failure to immediately notify the police that she had been raped" and her "inability to recall the details of the crime clearly" could "be consistent with that of a person who was raped"); *United States v. Smith*, 1998 U.S. App. LEXIS 5772, *3 (6th Cir. Mar. 19, 1998) (admitting psychologist's testimony that "she was familiar with reactions of women who have been victims of rape or sexual assault and that women often do not report the

incidents immediately" to rebut defendant's assertion that alleged victims "were unreliable because they did not immediately report their rapes and assaults"); *Alzanki*, 54 F.3d at 1006 (upholding, as reliable under *Daubert*, testimony based on expert's general research and personal interaction with hundreds of abuse victims that alleged victim's "behavioral response to the non-sexual abuse administered by the [defendants] was consistent with the behavior of abuse victims generally"). This Court should do the same.

The defendant here objects that Dr. Bonomi's notice did not include case-specific opinions or conclusions and provided no bases for her opinions. *See* ECF No. 15, Def. Mot. at 11. Contrary to the defendant's assertions, the notice explains that Dr. Bonomi has conducted extensive research on victims of domestic violence, the cycle of violence, and recantation, which forms the bases of her opinions. She has also published extensively, as recognized by the Sixth Circuit in affirming the admission of her testimony. Additionally, while the defendant suggests that the government would not be allowed to ask Dr. Bonomi hypothetical questions, the D.C. Circuit has allowed such testimony from teaching experts. *See United States v. Boney*, 977 F.2d 624, 629 (D.C. Cir. 1992) (holding that Rule 704(b) allows an expert to state that certain conduct in a hypothetical fits a specific role in a criminal enterprise); *see also United States v. Harley*, 990 F.2d 1340, 1343 (D.C. Cir. 1993) (trial court properly allowed the government to ask narcotics expert hypothetical questions). Therefore, the government would be allowed to elicit opinions related to hypothetical questions in the areas outlined in Dr. Bonomi's expert notice.[12] This Court should deny the defendant's request to have Dr. Bonomi's testimony excluded.

---

[12]     With respect to Dr. Bonomi's testimony regarding recantation, the government is aware of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and M.B. has not recanted her account. Dr. Bonomi's notice speaks to general behaviors observed in victims of domestic violence, and the reasons for those behaviors. Dr. Bonomi has not reviewed case-specific material related to M.B.

### v.  **CAST**

The government intends to elicit expert testimony from a member of the Federal Bureau of Investigation (FBI) Cellular Analysis Survey Team (CAST) in the fields of cellular phone technology, cellular towers, and the analysis of historical cellular phone records for the purpose of determining the approximate location from which a phone was used at the particular time or ranges of times, as well as the analysis of location information including Global Positioning System (GPS) data. *See* Gov. Ex. 1 at 11-12. The CAST expert will review material obtained via a search warrant to the cellular providers used by the defendant and M.B. As outlined above, the government sought a warrant for Cell Site Location Information (CSLI) on October 7, 2024. As of the date of this filing, it has received returns from M.B.'s cellular service provider, but not the defendant's.  Upon receipt of all the records, the CAST expert will analyze and plot the data.

Testimony from a CAST expert is relevant and highly probative in this case because it will help to establish that the defendant transported M.B. across state lines, in support of the Kidnapping charge, by corroborating her testimony that the defendant drove her from Maryland to the District of Columbia, and then back to Maryland. The cell site evidence is also expected to support M.B.'s testimony that the defendant likely kept her cell phone in his possession when he fled police, which is probative of his consciousness of guilt. Moreover, the cell site data may be used to corroborate the victim's account of the prior, uncharged sexual assault at the hotel in Virginia, outlined in the government's motion to admit other crimes evidence (ECF No. 14). Thus, it meets Rule 702's relevance requirement.

The government's delay in seeking a warrant for cell site location information does not merit exclusion of the evidence. It is well settled that the government may continue to investigate its case as trial approaches. Indeed, Rule 16 contemplates that new lines of investigation may be

undertaken, and that evidence may be discovered and disclosed, even after trial begins. *See* FED. R. CRIM. P. 16(c) (A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party . . ."); *United States v. Marshall*, 132 F.3d 66, 70 (D.C. Cir. 1998) (government introduced evidence resulting from investigation it conducted during trial); *United State v. Edmonson*, 962 F.2d 1535, 1545-46 (10th Cir. 1992) (result of fingerprint test conducted the month after trial began did not violate Rule 16 despite defendant's claim that it could have been discovered earlier with diligence). As the D.C. Circuit observed in *Marshall*:

> Rule 16 does not prevent the government from introducing any new evidence after a trial begins; indeed, Rule 16 itself contemplates that evidence may be disclosed "during trial." FED. R. CRIM. P. 16(c). Knowing the government might legitimately acquire and introduce new evidence during trial, the defense knew that there was a risk in telling the jury that the government would not link [the defendant] to the phone numbers from which the informant's pages were returned."

132 F.3d at 70.

Here, the government continued its investigation through the acquisition of a warrant for cellular location information. When that information is provided by the cell phone companies, it will be provided to the defense. Delayed disclosure of this information is not violative of Rule 16. *See United States v. Bikundi*, 926 F.3d 761, 783 (D.C. Cir. 2019) (declining to decide whether the government's disclosure of a report towards the end of its case-in-chief violated Rule 16, but finding the district court did not abuse its discretion by not excluding the report). As to the resulting delay in a fulsome expert report in response to the government's continued investigation, the appropriate remedy, if any, is a continuance, as discussed below in Section III.

### vi.  **Fact Witnesses**

The defendant asks this Court to exclude fact witness testimony from M.B.'s treating physicians at Washington Hospital Center and the dentist who repaired her tooth, after the

defendant broke it in half during the assault, based on the government's inadvertent delayed disclosure of M.B.'s medical records. This Court should deny the defendant's request.

"Rule 16 requires the government to produce scientific tests and documents that are within the government's control and material to preparing the defense." *United States v. Archbold-Manner*, 581 F. Supp. 2d 22, 23-24 (D.D.C. 2008) (citing FED. R. CRIM. P. 16(a)(1)(E-F); *United States v. Libby*, 429 F. Supp. 2d 1, 5 (D.D.C. 2006). While M.B.'s medical records fall within Rule 16's ambit, exclusion is an inappropriate sanction because the records were provided sufficiently in advance of trial for the defendant to make use of them. Moreover, when addressing a Rule 16 violation, the Court "should impose the least severe sanction that will accomplish the desired result – prompt and full compliance with the court's discovery orders." *Marshall*, 132 F.3d at 69. Here, the defendant was provided with the records promptly upon advising government counsel that he had not received them. Because the defendant received the records months out from trial, he has ample time to make use of them. And even if this Court finds that the government violated Rule 16 based on its inadvertent delayed disclosure of M.B.'s medical records, there was no bad faith and exclusion of relevant fact witness testimony would be improper.

It is inapposite that the defendant did not know these fact witnesses would testify at trial. Rule 16 does not require the government to disclose the identity of its witnesses prior to trial. *See United States v. Bolden*, 514 F.2d 1301, 1312 (D.C. Cir. 1975). And while the government must disclose *Brady* and *Giglio* information, that obligation does not extend to the names of inculpatory witnesses. *United States v. Ford*, 2016 U.S. Dist. LEXIS 13158, at *4 (D.D.C. Feb. 4, 2016) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to

discovery in a criminal case, and *Brady* did not create one.")); *United States v. Pray*, 764 F. Supp. 2d 184, 189–90 (D.D.C. 2011) (finding that while exculpatory material must be given to defense with enough time to make use of it at trial, the actual names of victims were not exculpatory). This Court should not exclude fact witness testimony solely because the defendant was unaware of the identity of certain witnesses until three months prior to trial.

## III.    TIMELINESS OF EXPERT DISCLOSURES

The defendant moves to exclude testimony from SANE Expert Erin Pollitt, strangulation expert Beth Weekley, Bode DNA analysts Brett King and Nicole Hopkins, and an FBI CAST examiner because their notices were not complete by the October 11, 2024, expert notice deadline. As to the DNA analysts, their notices are now complete. As to the SANE, strangulation, and CAST experts, the government respectfully requests that the Court permit it to supplement its notices upon receipt of the expert's final reports. And, of course, the government will not object to the defendant filing a supplemental motion to exclude at this time to address any perceived deficiencies in these notices. Further, should the defense require a trial continuance in order to properly respond, the government would not oppose it. However, the drastic remedy of exclusion is not warranted, and the Court should deny the defendant's motion.

### A.    Discovery Related to the Experts

#### i.  Bode DNA Analysts

The DNA analysts' reports were disclosed on October 1, 2024 (King) and October 21, 2024 (Hopkins). The full discovery file from Bode was disclosed on October 25, 2024, when the government received it.

### ii.  Strangulation and SANE

The SANE report was disclosed on February 15, 2024, along with photographs from the examination. M.B.'s medical records were disclosed on October 21, 2024.[13] Ms. Pollitt and Ms. Weekley's general notices were provided on October 11, 2024, and their case-specific opinions are in progress.

### iii.  CAST Examiner

The government applied for a cell site location information (CSLI) warrant on October 7, 2024. It disclosed the records it received from T-Mobile on October 21, 2024. It has not yet received records from Verizon and was informed by Verizon that they are experiencing an approximately 40-day backlog. The Verizon records will be provided to the defense upon receipt, and the CAST expert will analyze the data promptly and produce a report.

### B.    Argument

Federal Rule of Criminal Procedure 16(d)(2) provides that, "[i]f a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection . . .; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances. FED. R. CRIM. P. 16(d)(2). The Court has wide discretion in imposing a sanction if it finds that Rule 16 has been violated. *United States v. Gray-Burriss*, 791 F.3d 50, 54-55 (D.C. Cir. 2015); *Marshall*, 132 F.3d at 69. And the court should impose "the least severe sanction that will accomplish the desired result – prompt and full compliance with the court's discovery orders." *Marshall*, 132 F.3d at 69. Ordinarily, a continuance

---

[13]    Though, as outlined above, undersigned counsel reasonably believed they were disclosed on March 29, 2024.

is the preferred sanction for a discovery delay because "it gives the defense time to alleviate any prejudice it may have suffered from the late disclosure." *Id.* at 70.

Here, while Rule 16 gives the Court the option of suppressing evidence if it finds a discovery violation, "such a severe sanction would seldom be appropriate where . . . the trial court finds that the government's violation did not result from bad faith and that a less drastic remedy (such as a continuance) will mitigate any unfair prejudice." *Marshall*, 132 F.3d at 70. The sanction of exclusion is "inappropriate" however, when it would "subvert [] one of Rule 16's goals: 'contributing to the accurate determination of the issue of guilt or innocence.'" *Marshall*, 132 F.3d at 70 (quoting FED. R. CRIM. P. 16 adv. comm. note (1974 amend.)). As outlined above, each of the proffered experts provides critical testimony for the government's case, and the exclusion of any one of them would militate against the truth-seeking function of trial.

Importantly, there was no bad faith in the government's delayed disclosure. While incomplete as of the October 11, 2024, deadline, the defendant is on notice –three months prior to trial – of the government's proposed expert witnesses. Notably, the disclosures were substantial, and, as to the DNA experts, were completed shortly thereafter. Exclusion is inappropriate under these circumstances. *See*, *e.g. United States v. Stevens*, 380 F.3d 1021, 1025-26 (7th Cir. 2004) (observing that the government could not have produced a report sooner because it was received the day it was produced).

As to the SANE, strangulation, and CAST experts, the government is diligently working to have their reports finalized as soon as possible. Unfortunately, there are factors outside of the government's control which contribute to the delay. These factors include, but are not limited to, the expert contracting process, which is heavily impacted by budgetary restraints and the transition to a new fiscal year. Moreover, the government has no control over the backlog at Verizon, whose

records are needed for the CAST analysis. The government recognizes that these practical impediments have no bearing on the defendant's ability to prepare for trial. And the government might have mitigated some of the delay by attempting to procure expert contracts or applying for a cell site warrant at an earlier date. However, this Court can be assured that the delay was not the product of gamesmanship or bad faith, but rather the unfortunate reality of staffing, workloads, and the need to prepare for other proceedings and trials.  And each of these experts have been identified by the government well in advance of trial. The delay does not warrant exclusion of the experts' testimony. *See, e.g.*, *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 211-12 (D.D.C. 2015) (exclusion of a narcotics expert was not appropriate where the government identified the expert to defense more than three months before trial and the witness's report was not so vague as to prevent the defendant from understanding the witness's conclusions) (*citing United States v. Martinez*, 476 F.3d 961, 967-68 (D.C. Cir. 2007) (upholding admission of expert testimony despite a Rule 16 challenge where the government provided information to the challenged testimony in opposition to a motion to exclude and approximately six weeks prior to trial)); *United States v. Thornton*, 642 F.3d 599 (7th Cir. 2011) (where prosecutor mistakenly overlooked the court's disclosure order and noticed its drug expert ten days before trial, trial court did not err in offering a continuance – which the defendant declined – rather than excluding the expert).

Here, the government has gained no advantage by the delayed disclosure, and in fact, would be disadvantaged by a trial continuance. Indeed, it has already arranged for the presence of its witnesses and delay is likely to cause emotional distress to the victim. *See*, *e.g. United States v. Lineback*, 330 F.3d 441, 444 (6th Cir. 2003) (affirming district court's factual determination that "prejudice suffered by the victims here would result in prejudice to the government"). As the

committee notes to Rule 16 itself recognize, a "touchstone in measuring the prejudice suffered by a party is the degree to which an "unfair advantage" has accrued to the party who has not complied with its disclosure obligations." *United States v. Williams*, 2011 U.S. Dist. LEXIS 52013, *8-9 (E.D. La. Apr. 4, 2011) (citing Fed. R. Crim. P. 16 advisory committee's note to 1966 amendment). The government has gained no advantage by the delayed disclosure, which supports a finding that there was no bad faith by the government. This Court should not exclude its experts. *See, e.g*. *Thornton*, 642 F.3d at 602 (where prosecutor mistakenly overlooked the court's disclosure order and noticed its drug expert ten days before trial, trial court did not err in offering a continuance – which the defendant declined – rather than excluding the expert); *United States v. Garrett*, 238 F.3d 293, 299 (5th Cir. 2000) (excluding the government's evidence was improper because, among other things, the government did not act in bad faith).   The defendant will have all of the information he is entitled to substantially in advance of trial. That said, the government would consent to a brief continuance to address his concerns and claims of prejudice. In conclusion, the appropriate remedy, if any, is a continuance, not exclusion.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the government requests that the Court deny the defendant's Motion to Exclude.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
District of Columbia


*s/ Meredith E. Mayer-Dempsey*
Meredith E. Mayer-Dempsey
NY Bar No. 5213202
Janani Iyengar
NY Bar No. 5225990
Assistant United States Attorneys
United States Attorney's Office
for the District of Columbia
601 D Street, Northwest
Washington, D.C. 20530
(202) 252-7259
Meredith.Mayer-Dempsey@usdoj.gov