UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 1:24-cr-00039-APM |
| | : | |
| BRANDON TYRIQ WHITE, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA

The United States, by and through the undersigned attorneys, respectfully files its opposition to defendant Brandon Tyriq White's Motion to Withdraw Guilty Plea (ECF No. 71, hereinafter "motion"). The defendant seeks to withdraw his guilty plea, arguing that his plea was constitutionally defective. ECF No. 71 at 2. Specifically, the defendant claims that prior counsel failed to maintain contact with him. *Id.* at 2. He was pressured to accept the plea and that conversation were rushed. *Id.* Key details were not explained to him. *Id.* And that a "more favorable", prior plea offer was not communicated to him. *Id.* These claims lack sufficient detail for the government to offer a fulsome response; regardless, they should be denied.

First, looking at the plea colloquy in this case, the defendant's decision to accept the plea was a voluntary and intelligent choice. There was no constitutional defect. The plea colloquy contained all the required procedural safeguards. *See infra*, Section I.A.

Second, the defendant makes no claim of actual innocence. Therefore, the government does not address that issue in this opposition.

1

Third, considering the substantial evidence of the defendant's guilt, prior counsel made a reasonable, tactical decision to aggressively negotiate a plea on the defendant's behalf – their decision to do so, at the potential expense the defendant being found guilty at trial, was reasonable and well within the range of constitutionally adequate performance. *See infra*, Section I.D.

Fourth, the defendant voluntarily admitted, under oath, to kidnapping and sexually assaulting M.B. The evidence supporting those offenses is significant. The defendant has therefore failed to meet his burden and establish that he is plea was not knowing, intelligent, or voluntary.

Finally, allowing the defendant to withdraw his guilty plea substantially prejudices the government. Allowing the defendant to withdraw his plea and start anew would cause the victim in this case overwhelming and undue trauma. The substantial prejudice the victim would face is imputed to the government. *See infra*, Section III.

Accordingly, the defendant's motion to withdraw his guilty plea should be denied.

**FACTUAL BACKGROUND**

In 2023, the defendant and M.B. were in a romantic relationship, and they lived together at the defendant's Washington DC residence in October and November of 2023. In November of 2023, M.B. left the defendant due in part to his physically abusive behavior towards her. When M.B. left the defendant's residence, she did not tell him she was moving out, and only brought with her a small bag containing some of her belongings. Following her departure, M.B. terminated their relationship, but the defendant still had many of M.B.'s vital belongings at his residence including her birth certificate.

In December of 2023, M.B. sought to recover her belongings by meeting up with the defendant

in person to discuss the return of her property. The two settled on a Ruby Tuesday restaurant in Prince George's County, Maryland, and met on the evening of December 18, 2023. While at Ruby Tuesday, they sat at a table and ordered drinks and food. At some point, M.B. stepped away to take a phone call from another man for approximately thirty (30) minutes. She returned to the table to find the food gone, and that the defendant had paid the bill and left the restaurant. M.B. texted the defendant that she was headed to another store and began walking through the parking lot outside of Ruby Tuesday. In the parking lot, the defendant approached M.B. in his car and the two got into an argument regarding M.B. taking the phone call. M.B. initially walked away from the defendant and toward the Wal-Mart. The defendant eventually caught up to M.B. in his car and re-engaged in the argument. As the argument intensified, the defendant forced M.B. against her will into the back of the car. M.B. tried to escape, but the defendant stopped her by grabbing her and ultimately binding her hands with zip ties. He then drove her from Maryland to his grandmother's residence in Southeast, Washington, D.C.

Once in D.C., M.B. again tried to escape by running away from the defendant and calling out for help. He caught her and forced her onto the front steps of the home. There, the defendant used his hands and arm to apply pressure to M.B.'s throat, making it difficult for her to breath. The defendant only released M.B. when she agreed that she would not scream or run. The defendant then led M.B. into the home to a bedroom on the second floor. While inside the bedroom, the defendant forcibly penetrated M.B.'s mouth with his penis against her will. M.B. tried to get away but the defendant held her still, on her knees, while he forced her to perform oral sex. He then made M.B. lay on the bed where he forcibly penetrated her vagina with his penis against her will. During these events, the defendant was armed with or had readily accessible a firearm, which he placed on the bedside table.

After the sexual assaults and following repeated pleas with the defendant regarding an urgent

3

work assignment, M.B. convinced the defendant to drive M.B. back to Maryland. The defendant agreed on the condition that she return to him later that night. As the defendant drove M.B. from Washington, D.C. to Prince George's County, Maryland, M.B. convinced the defendant to stop at a 7-11 in Maryland so that she could make a purchase. M.B. tried to escape while she was in the 7-11, but the defendant again prevented her from leaving. He followed her into the 7-11 and, when the two were by his car outside, he again tried to force her back into his car. Surveillance footage from the 7-11 captured the defendant attempting to push M.B. into his vehicle, and her escape. When M.B. tried to escape on foot, the defendant chased her down and ultimately caught her. He assaulted her, breaking her front tooth in half. Ultimately, M.B. was able to escape. The defendant then fled in his car.

  M.B. was treated by Prince George's County Emergency Medical Services on scene, and later went to a hospital where she underwent emergency medical treatment and received a Sexual Assault Nurse Examination (SANE), commonly known as a "rape kit." M.B. had numerous injuries, including 1) lacerations and bruising to her wrists; 2) bruising to her legs, buttocks, hip, chest, and arms; 3) bruising and lacerations to her throat; 4) petechia – an indication of bleeding under the skin – to her throat and mouth; 5) a broken tooth and bruising and bleeding to her lip; and 6) a laceration to the perineal region of her genitals. Evidence at trial would have established that the injuries to M.B., particularly the defendant applying pressure to her neck outside of the D.C. residence until she saw stars caused a substantial risk of death, as it prevented the regular flow of blood and air in her body.

  As part of the SANE, M.B. consented to have swabs of her body taken for potential DNA evidence, to include vaginal/cervical swabs, neck swabs, and external genitalia swabs. Later testing revealed that the DNA obtained from the vaginal/cervical swabs is consistent with a mixture of two individuals to include M.B. and a male contributor. The sperm fraction from the sample is at least 600

4

septillion times more likely to be observed if it originated from the defendant than if from an unknown, unrelated individual. The DNA obtained from the neck swabs was also consistent with a mixture of two individuals, to include M.B. and a male contributor. Assuming a mixture of two individuals, the DNA profile obtained is at least 3.8 billion times more likely to be observed if originated from the defendant and M.B. than from M.B. and one unknown, unrelated individual. Finally, the DNA obtained from the external genitalia swabs was consistent with a mixture of two individuals – M.B. and a male contributor. The DNA obtained from the sperm fraction from this sample is at least 2.9 septillion times more likely to be observed if it originated from the defendant than if from an unknown, unrelated individual. After M.B. was treated at the emergency room that night for her injuries, she had to go to a dentist to have her front tooth, which was split in half, repaired.

When the defendant was arrested on December 23, 2023, in Charles County, Maryland, police recovered his firearm from the hotel where he was staying. The gun was registered to the defendant in the state of Maryland, but the defendant had no valid license or registration to carry the gun within the District of Columbia, to include to the D.C. residence where he took M.B. on the night of December 18, 2023. The gun is a Glock Semi-Automatic firearm bearing serial number BUAT528.

## PROCEDURAL HISTORY

As mentioned above, the defendant was arrested on December 23, 2023. Initially, he was arrested on a District of Columbia Superior Court Warrant. He was subsequently charged in Maryland and held pending proceedings in that jurisdiction. On January 23, 2024, the defendant was charged by federal indictment with Kidnapping, in violation of 18 U.S.C. § 1201(a)(1), two counts of First Degree Sexual Abuse While Armed, in violation of 22 D.C. Code §§ 3002(a)(1), 3002(a)(2), 3020(a)(6), 4502 (2001 ed.); Aggravated Assault While Armed, in violation of 22 D.C. Code §§ 404.01, 4502 (2001 ed.);

5

three counts of Possession of a Firearm During a Crime of Violence or Dangerous Offense, in violation of 22 D.C. Code § 4504(b) (2001 ed.); Strangulation, in violation of 22 D.C. Code § 404.04(a); and Carrying a Pistol Without a License, in violation of 22 D.C. Code §§ 4504(a)(1). ECF No. 1.

On February 5, 2024, the defendant was arrested on the federal arrest warrant. He was presented in this matter the same date. ECF No. 3. The defendant was represented by Michael Lawlor (and eventually Adam Demetriou) at presentment and throughout the pendency of this matter.

*Plea Negotiations*

On March 23, 2024, the government extended a plea offer to via email to one count of Kidnapping and one count of First Degree Sexual Abuse While Armed. The government agreed to cap its allocution at 262 months. Exhibit 1. On July 22, 2024, the government placed this plea offer on the record with defendant present. The plea was rejected and a trial date of January 13, 2025, was set. See minute order on July 22, 2024. At a November 4, 2024, motions hearing this court inquired when the original plea offer was rejected. *See* ECF 44, November 4, 2024, Motions Hearing Proceedings at 19. Attorney Lawlor responded, "that's why – when we set the trial date." *Id.*

Between July 2024 and January 2025, the parties engaged in significant pretrial motions litigation. On January 3, 2025, at a pretrial conference, the trial was continued at defense's request. At that time, defense represented they would not be ready for trial because they had failed to seek or obtain expert testimony from certain witnesses. The court continued the trial to February 18, 2025. See minute order on January 3, 2025.

On January 7, 2025, the government extended a plea offer via email to one count of First Degree Sexual Abuse While Armed and Assault with Significant Bodily Injury. The government agreed to cap its allocution at 180 months. The email stated that the offer would expire on January 24, 2025. Exhibit 2.

6

Sometime between January 7, 2025, and February 14, 2025, defense counsel reached out via telephone to the assigned Assistant United States Attorneys. Following that phone conversation, on February 14, 2025, the government extended a final plea offer to one count of Kidnapping. The government agreed to cap its allocution to the low end of the guidelines, 210 months. Exhibit 3. The plea was accepted and entered on February 14, 2025. ECF No. 58.

*The Plea Hearing*

On February 14, 2025, the defendant pled guilty to one count of Kidnapping, in violation of 18 U.S.C. § 1201(a)(1) *See* ECF No. 58 at 1. Attorneys Lawlor and Demetriou represented the defendant at the plea hearing.

On that same date, the Court conducted an in-person, plea hearing. Before accepting the defendant's guilty plea, counsel requested that the defendant be allowed to speak to his mother. Ultimately, a face-to-face meeting could not be accommodated so the court passed the matter to allow counsel to facilitate conversation between the defendant and his family. The court then took a forty-seven (47) minute recess. *See* ECF 70, February 14, 2025, Plea Hearing Proceedings Transcript (hereinafter, "Plea Hr'g Tr.") at 3-5. Following this exchange, defendant signed the plea paperwork. Plea Hr'g Tr. at 5[1].

The Court then conducted an extensive Rule 11 colloquy with the defendant. At the beginning of the colloquy, the defendant was placed under oath and advised of the penalties for failing to tell the truth. Plea Hr'g Tr. at 7. The Court specifically asked if the defendant had enough time to consult with counsel and if he was satisfied with his representation. He answered both inquires affirmatively. Plea Hr'g Tr. at 8. The court inquired if the defendant had time to review the Statement of Offense; he

---

[1] The defendant has made no specific representations about what was said during that conversation; the government was obviously not party to the conversation and does not know what the defendant wanted to say to his mother.

answered affirmatively. Plea Hr'g Tr. at 19. The court then asked:

> THE COURT: All right. Now, Mr. White, the rest of this document contains a set of facts. These are a set of facts the government believes it would be able to prove at a trial, and it describes your conduct that is the basis for the guilty plea. Now, have you had a chance to read through these pages carefully, sir?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: And do you agree, Mr. White, that these pages that describe your conduct, that they fairly and accurately describe your conduct?
>
> THE DEFENDANT: Yes, Your Honor.

Plea Hr'g Tr. at 21.

Following this exchange, the court went over the rights the defendant was giving up in exchange for pleading guilty. Plea Hr'g Tr. at 22-28. The hearing ended at 4:43 pm, nearly ninety (90) minutes after it resumed. Plea Hr'g Tr. at 30. At no point in that ninety (90) minutes, did the defendant express any hesitancy, confusion, or concern about accepting responsibility for his actions and pleading guilty.

## LEGAL AUTHORITY

Pursuant to Federal Rule of Criminal Procedure 11(d)(2), a defendant may withdraw his guilty plea after it is accepted by the court but prior to sentencing if he can show a fair and just reason for the withdrawal. The Supreme Court's general test for the validity of a plea agreement is whether the plea represents a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985). It is the defendant's burden to prove there are valid grounds for the withdrawal. *See* Fed. R. Crim. Pro. 11(d)(2)(B). In considering whether there is a "fair and just" reason to allow a defendant to withdraw his plea, the Court must consider three factors: (1)

whether the guilty plea was tainted, (2) whether the defendant has asserted a viable claim of innocence, and (3) whether the delay between the guilty plea and the motion to withdraw has prejudiced the government's ability to prosecute the case. *United States v. West*, 392 F.3d 450, 455 (D.C. Cir. 2004); *United States v. Hanson*, 339 F.3d 983, 988 (D.C. Cir. 2003).

Of these three factors, the first factor is the most important and requires a showing that the court's taking of the guilty plea either failed to conform to the requirements of Rule 11 or was in some other sense constitutionally deficient. *See West*, 392 F.3d at 455-58; *United States v. Horne*, 987 F.2d 833, 837 (D.C. Cir. 1993); *United States v. Taylor*, 139 F.3d 924, 929 (D.C. Cir. 1998); *United States v. Ford*, 993 F.2d 249, 251 (D.C. Cir. 1993). While courts often balance these three factors, none of the D.C. Circuit's cases would have been decided differently "if the only inquiry undertaken were whether the defendant's guilty plea was taken in compliance with Rule 11." *United States v. Cray*, 47 F.3d 1203, 1207 (D.C. Cir. 1995) (internal citations omitted). Indeed, in this Circuit, the defendant's claim of actual innocence is only evaluated after the court has determined whether the alleged Rule 11 defect is sufficient to justify granting his motion to withdraw. *See Cray*, 47 F.3d at 1206-08 (indicating that by focusing on Rule 11 error first, courts will conserve resources by not having to exhaustively examine all three factors in every case); *United States v. Tolson*, 372 F. Supp. 2d 1, 9 (D.D.C. 2005). As such, a defendant who "fails to show some error under Rule 11 has to shoulder an extremely heavy burden if he is to ultimately prevail," *Cray*, 47 F.3d at 1208, and insignificant or immaterial defects in the Rule 11 plea proceedings are insufficient to meet the necessary burden. *See, e.g.,* Fed. R. Crim. Pro. 11(h) ("variance from the requirements of this rule is harmless error if it does not affect substantial rights"); *see also United States v. Vonn*, 535 U.S. 55, 66 (2002) (noting that Congress added this provision to Rule 11 to end the practice of reversing automatically for any Rule 11 error). This heavy burden exists

because the judicial system regards the withdrawal of guilty pleas as "inherently in derogation of the public interest in finality," *Horne*, 987 F.2d at 837, which "undermines confidence in the integrity of our procedures; and, by increasing the volume of judicial work, inevitably delays and impairs the orderly administration of justice." *Hill*, 474 U.S. at 58. As the Supreme Court has noted, it is no trifling matter to allow a defendant to withdraw a guilty plea after he has "sworn in open court that he actually committed the crimes, after he has stated that he is pleading guilty because he is guilty, after the court has found a factual basis for the plea, and after the court has explicitly announced that it accepts the plea." *United States v. Hyde*, 520 U.S. 670, 676 (1997).

## ARGUMENT

### I. The Defendant's Plea Adhered to the Requirements of Rule 11 and Was Not Tainted by Ineffective Assistance of Counsel

While defendant does not explicitly say so, the crux of his argument is that his plea was constitutionally defective because of ineffective assistance of counsel. The defendant's arguments fail. The plea colloquy conformed to the requirements of Rule 11 and was not constitutionally deficient. Additionally, the defendant has failed to demonstrate that prior counsel were ineffective. The overwhelming evidence suggests that the defendant's decision to plead guilty was the product of reasonable, rational advice of counsel. Therefore, the defendant's motion should be denied.

#### A. The plea colloquy conformed to the requirements of Rule 11 and was not constitutionally deficient

In the instant case, the transcript demonstrates that the plea was attended by "all the required procedural safeguards" of Rule 11. *Cray*, 47 F.3d at 1208. A guilty plea is constitutionally valid if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *United States v. McCoy*, 215 F.3d 102, 107 (D.C. Cir. 2000) (quoting *Hill*, 474 U.S. at 56).

To assess whether the plea was voluntary and intelligent, courts look to the record of the plea colloquy to determine whether it would "lead a reasonable person to believe that the defendant understood the nature of the charge." *United States v. Ahn*, 231 F.3d 26, 33 (D.C. Cir. 2000).

As detailed above, during the hearing, the Court conducted a lengthy and comprehensive review of the defendant's constitutional rights, his decision to plead guilty, and his understanding of the proceeding and his plea agreement. The Court reviewed the relevant facts in great detail and gave the defendant an opportunity to respond to or refute the facts before finding that there was an adequate factual basis for the plea. The Court gave the defendant ample opportunity to ask questions and to confer with his attorney (and, unusually, his family), and the defendant took advantage of such opportunities. Most notably, the defendant affirmed, under oath, that he was satisfied with the quality of his representation and had adequate time to consult with counsel prior to the entry of his plea. The D.C. Circuit has emphasized that, in the context of a motion to withdraw a plea, "[i]t is neither unfair nor unjust…to hold the defendant to his solemn representation to the court." *Horne*, 987 F.2d at 837; *see also United States v. McKnight*, 570 F.3d 641, 649 (5th Cir. 2009) ("[S]olemn declarations in open court carry a strong presumption of veracity."). Accordingly, there is no basis upon which to find that the Rule 11 proceeding was constitutionally inadequate or lacking in any way.

### B. Prior counsel's performance was reasonable and therefore did not taint the defendant's guilty plea.

In *Hill*, the Supreme Court applied to the guilty plea context the two-prong test for determining ineffective assistance of counsel that it had previously announced in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Hill*, 474 U.S. at 58. To show that his plea was based upon constitutionally deficient assistance of counsel, the defendant bears the burden to show (1) that his counsel's performance fell below an objective standard of reasonableness by identifying specific acts or omissions of counsel that

11

are alleged not to have been the result of reasonable professional judgment and (2) that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *United States v. McCoy*, 215 F.3d 102, 107 (D.C. Cir., 2000) The burden to show deficiency is substantial, in that the defendant must prove that his lawyer made errors "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* 466 U.S. at 687; *see also United States v. Brisbane*, 729 F. Supp. 2d 99, 109 (D.D.C. 2010) (noting that the defendant's burden is a heavy one).

The Court must evaluate the asserted errors of counsel in the context of the attorney's *overall performance* to determine whether the defendant's claims overcome the presumption of competence. *See Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (emphasis added). *Strickland's* deficiency prong requires the Court to consider the unique circumstances of the case and determine whether counsel acted reasonably "under prevailing professional norms." *Strickland,* 466 U.S. at 688. This standard is not overly rigorous, and attorney performance need only to meet a minimal standard of competence. *See United States v. Catlett*, 97 F.3d 565, 570 (D.C. Cir. 1996); *Hinton v. Alabama*, 571 U.S. 26, 272 (2014). There is a wide range of what might be considered reasonable professional assistance, and there are numerous ways upon which to provide constitutionally effective assistance in any given case. *Strickland*, 466 U.S. at 689 (noting that "even the best criminal defense attorneys" would not defend a particular client in the same fashion).

> When engaging in an analysis of reasonable performance, the Supreme Court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence…A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties

> inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Strickland,* 466 U.S. at 689.

Because of this, there is a presumption that, "under the circumstances, the challenged action might be considered sound trial strategy." *Id*; *see also Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) (noting that surmounting this presumption of is "never an easy task"). In fact, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690.

This presumption is especially important when evaluating an attorney's performance in the context of a guilty plea, without the benefit of a trial record. Relevant here, "[p]lea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks…These considerations make strict adherence to the Strickland standard all the more essential when reviewing the choices an attorney made at the plea bargain stage." *Premo v. Moore*, 562 U.S. 115, 125 (2011). An attorney's performance cannot be deemed deficient where she balanced her assessment of loss at trial against the benefits for her client of a potential plea agreement, *United States v. Curry*, 494 F.3d 1124, 1130 (D.C. Cir. 2007), or where she provided reasonable advice on how to best proceed without considering every possible motion or defense. *See, e.g., McMann v. Richardson*, 397 U.S. 759, 770 (1970) ("In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession."); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973) ("A guilty plea, voluntarily and intelligently entered, may not be vacated because

the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge.").

The defendant makes a series of claims in his motion to withdraw his guilty plea that are unsubstantiated by the record. *See United States v. Marrow*, 637 Fed. Appx. 1 (D.C. Cir., 2016) (affirming the trial court's denial of defendant's motion to withdraw his guilty plea where the defendant made unsubstantiated and conclusory allegations and failed to make any prior mention of his counsel's insufficiency). For example, he claims that "key details and opportunities were not disclosed or explained" to him, therefore, the Court should grant his motion to withdraw his plea. ECF no. 71 at 2. He does not indicate what "key details" were withheld by prior counsel. He does not state when he learned of the "more favorable plea" that was not communicated to him, nor does he give any specific information related to what the terms of that plea offer were or why he believed it to be a more favorable offer. He does not discuss with any specificity how he was pressured into accepting the plea. Without these details, it is difficult for the government to ascertain what, if any, specific aspect or aspects of prior counsels' representations he claims were deficient.

What the defendant does claim with some specificity is that counsel failed to maintain communication with his mother and that his family was repeatedly unable to review evidence in the matter. ECF No. 71 at 2. Counsel has no obligation to the defendant's family – he is required to communicate to and with his client, the defendant. Further, it is actually *appropriate* for counsel to refuse to review discovery and evidence with family members. Many items of evidence in this matter were provided under protective order and prohibited counsel from sharing material outside the defense team. While this is undoubtedly frustrating for the defendant and his family, it is not ineffective.

Defendant also claims that the trial court indicated there would be no further continuances of the

14

trial date. ECF No. 71 at 2. It is unclear where that belief originated. The original trial date was continued at the January 3, 2025, pretrial conference hearing. *See* ECF No. 69, January 3, 2025, Pretrial Conference Tr. Pg 67-69. However, there is nothing in the record that the trial would only be continued one time and that the parties would be forced to proceed on February 18, 2025.

In light of the substantial evidence of the defendant's guilt, prior counsel made a reasonable, tactical decision to aggressively negotiate a plea on the defendant's behalf – their decision to do so, after extensive motions litigation, was reasonable and well within the range of constitutionally adequate performance.

### C. Even if prior counsel's performance is deemed deficient, it did not result in any prejudice to the defendant.

Under *Strickland's* second prong, it is the defendant's burden to show that there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *United States v. Newman*, 805 F.3d 1143, 1147 (D.C. Cir. 2015) ("The burden of establishing prejudice falls squarely on the defendant's shoulders."). To prevail on prejudice in the plea context, the defendant must demonstrate a reasonable probability that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Premo*, 562 U.S. at 129 (quoting *Hill*, 474 U.S. at 59). In considering this claim, this Court can look to the strength of the government's evidence to determine that such a decision would have been highly unlikely. *See United States v. Perez*, 603 F.3d 44, 49 (D.C. Cir. 2000) (finding that counsel's alleged deficiencies could not have prejudiced the defendant because the government's case "was simply too strong"); *United States v. Gwyn*, 481 F.3d 849, 854 (D.C. Cir. 2007) (noting that there was no probability of a different result given "the overwhelming evidence" against the defendant.). For example, in *Premo*, the Supreme Court found that it was reasonable to determine that the defendant would not have gone to trial and rather would

15

have accepted a plea where "[the government's case] was already formidable and included two witnesses to an admissible confession. Had the prosecution continued to investigate, its case might well have become stronger. At the same time, [the defendant] faced grave punishments. His decision to plead no contest allowed him to avoid a possible sentence of life…the bargain counsel struck was thus a favorable one…and the decision to forgo a challenge to the confession may have been essential to securing that agreement." *Premo*, 562 U.S. at 129.

Additionally, this Circuit has also routinely found a lack of prejudice where, as here, the defendant would likely have been convicted at trial and would have faced a higher sentence as a result. *See, e.g.*, *United States v. Wilkins*, 734 F. App'x 1, 3-4 (D.C. Cir. 2018) (unpublished) ("Put together, the low probability of acquittal at trial and the sentencing risks of going to trial belie Wilkins's assertion that he would have rejected the plea agreement had he been more fully informed."); *United States v. Zaitar*, 641 F. App'x 1, 2 (D.C. Cir. 2015) (unpublished) (finding no prejudice "given the charges that Zaitar would have faced had he gone to trial, and his counsel's judgment (undisputed here) that his defense was 'awful'"); *United States v. Hunt*, 560 F. App'x 2, 3-4 (D.C. Cir. 2014) (unpublished) ("[T]he overwhelming evidence against Hunt, together with the somewhat favorable terms of the plea deal, suggest that, even if Hunt's counsel performed deficiently, there is no 'reasonable probability' that but for counsels' errors the outcome of the proceeding would have been different."); *In re Sealed Case*, 488 F.3d 1011, 1017-19 (D.C. Cir. 2007).

In the instant case, the evidence against the defendant is overwhelming. There is extrinsic evidence – CCTV footage – of key moments of the assaults and kidnapping. The footage shows the defendant trying to throw M.B. into his car and blocking her escape at the 7-11. It shows his anger and his rage toward M.B. during the assaults. There was also DNA evidence and medical record

16

documentation of injuries M.B. sustained from the assaults. CAST Analysis corroborated M.B.'s whereabouts and her allegation that her phone was turned off or lost at some point in the assault – preventing her from calling the police. The defendant was arrested with a firearm that matched the description M.B. gave officers the night of the assaults. Both SANE and Intimate Partner Violence experts were set to testify for the government at trial. Therefore, it strains credulity that the defendant would have elected to go to trial, and it is even more unlikely that he would have prevailed.

\* \* \*

Because the defendant has failed to satisfy the requirements of an ineffective assistance claim, he has therefore not met his burden to show that his plea was constitutionally deficient. That leaves the remaining two factors relevant to evaluating the defendant's motion: (1) whether the defendant has asserted a viable claim of innocence, and (2) whether the delay between the guilty plea and the motion to withdraw has prejudiced the government's ability to prosecute the case. Notably, in this Circuit, courts have the discretion to evaluate the defendant's claim of actual innocence only if the alleged Rule 11 defect is sufficient to justify granting the motion to withdraw. *See Cray*, 47 F.3d at 1206-08. The government contends that the Court could therefore end its analysis here. Nevertheless, the remaining factors are addressed below.

## II.     The Defendant has not Claimed Actual Innocence.

The defendant has not made any claims of actual innocence; thus, this court need not consider the issue.

## III.    The Government, and the Victims, Would be Substantially Prejudiced by a Withdraw of the Defendant's Guilty Plea

The defendant filed his Motion to Withdraw his Guilty Plea on June 16, 2025, a full four (4) months after the plea hearing. This kind of delay militates heavily against withdrawal. *See, e.g.*, *United*

17

*States v. Benton*, 639 F.3d 723, 727 (6th Cir. 2011) (collecting cases and noting that court had "declined to allow plea withdrawal when intervening time periods were as brief as one month"). Indeed, the D.C. Circuit has held that the "movant's reasons must meet *exceptionally high standards* where the delay between the plea and the withdrawal motion has substantially prejudiced the government's ability to prosecute the case." *United States v. Cray*, 47 F.3d 1203, 1206–07 (D.C. Cir. 1995) (emphasis added) (citation and internal quotation marks omitted); *see also Horne*, 987 F.2d at 837 (noting that "withdrawal of a guilty plea is inherently in derogation of the public interest in finality and the orderly administration of justice").

The purpose of allowing a defendant to withdraw a plea "is not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *United States v. Carr*, 740 F.2d 339, 345 (5th Cir. 1984); *see also Brady,* 397 U.S. at 757 ("The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision."). This is precisely what appears to have occurred here. The defendant made the decision to plead guilty. As explained above, he reviewed a written plea agreement with his counsel and signed it. This Court took great pains to ensure the defendant was making this choice freely and voluntarily, and that he was doing so without being under the influence of any outside pressure or undue influences. Nearly five months later he now seeks to withdraw his plea, which significantly prejudices the government. *See United States v. Valdez*, 362 F.3d 903, 913 (6th Cir. 2004) (finding that an unjustified 75-day delay alone supported the court's denial of the defendant's motion to withdraw his guilty plea)

M.B. anxiously awaited news from the government that the case had been resolved, and she

18

would not need to come to Court and testify in front of the defendant, the same man who raped her, in a room full of strangers. Months later, the defendant's efforts to withdraw his plea have resulted in the publication of personal details for M.B., yet again traumatizing her.

Most importantly, M.B. would be harmed exponentially if the defendant were allowed to withdraw his plea. M.B. spent months mentally preparing to confront her abuser. Fortunately for M.B., the defendant pled guilty and, by doing so, he admitted what he did in open court. Allowing the defendant to withdraw his plea would create undue stress and anxiety for M.B., who would be forced to relive a traumatic part of their lives that she believed was finally beginning to be behind her.

The substantial prejudice the victims would face is imputed to the government. *See, e.g.*, *United States v. Lineback*, 330 F.3d 441, 444 (6th Cir. 2003) (affirming district court's factual determination that "prejudice suffered by the victims here would result in prejudice to the government"); *United States v. Morrison*, 967 F.2d 264, 269 (8th Cir. 1992) ("Withdrawal of the plea would obviously require the prosecution and its witnesses to endure this emotional process again. Whether we classify this as prejudice to the government, or prejudice to the complaining victim, it is real prejudice, caused by the timing of Morrison's guilty plea and subsequent attempts to withdraw."). There is no guarantee that the government would be able to reestablish contact with, and the trust of, the victims after they had been assured that the defendant had pled guilty and already personal and graphic details of the assault had been made public. The news of having to endure a full-fledged trial will likely have meaningful consequences for the government and result in the loss of victim cooperation. As such, this is exactly the sort of situation in which prejudice has been established. *See, e.g.*, *United States v. Farrelly*, No. 3:19-CR-44-J-34PDB, 2021 WL 463767, at *19 (M.D. Fla. Feb. 9, 2021) ("Whether considered prejudice to the government or as another circumstance within the totality,

the Court finds that requiring the victim to testify and relive such traumatic experiences at this point in time after believing the matter to have been resolved weighs against granting [the defendant's] Motion.").

In light of the substantial prejudice to the government and the victims, and because the defendant's reasons for seeking to withdraw his plea do not meet the "exceptionally high standards" set out by the D.C. Circuit, this final factor weighs in favor of denying the defendant's motion to withdraw. *See Cray*, 47 F.3d at 1206–07.

## CONCLUSION

Accordingly, the government respectfully requests that this Court deny the defendant's motion to withdraw his guilty plea.

Respectfully submitted,

JEANNINE J. PIRRO
United States Attorney

*/s/ Dana Joseph*
Dana M. Joseph
Janani Iyengar
MN Bar No. 0393176
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7554
dana.joseph@usdoj.gov