UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 24-cr-39 (APM)** |
| | : | |
| **BRANDON TYRIQ WHITE,** | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case. The defendant is before the Court after kidnapping and violently sexually assaulting his former romantic partner in a premeditated attack. The defendant's conduct culminated in his attempt to force the victim back into his vehicle in the parking lot of a 7-Eleven by striking her in the mouth so forcefully that she lost a tooth. The defendant's conduct in this matter is not an isolated incident, but rather part of a larger campaign of terrorizing M.B. through physical and sexual abuse. For the reasons discussed herein, the government recommends that the Court sentence the defendant to 210 months of incarceration and 60 months of supervised release. This sentence appropriately weighs the sentencing factors under 18 U.S.C. §3553(a). In support of this recommendation, the government relies on the following points and authorities, as well as such other points and authorities as may be cited at the sentencing hearing.

## I. BACKGROUND

### A. Procedural Posture

On February 14, 2025, the defendant pled guilty to one count of Kidnapping, in violation of 18 U.S.C. § 1201(a)(1). The Court has set a sentencing date of August 26, 2026.

### B. Factual Background

On December 18, 2023, the defendant met up with M.B. - who he had previously been in a relationship with - in order for M.B. to collect her belongings. Notably, the relationship ended in part due to the defendant's physically abusive behavior toward M.B. The two met up at Ruby

Tuesday restaurant in Prince George's County, Maryland for the purpose of the belongings exchange, because M.B. was more comfortable meeting the defendant in a public place. While at Ruby Tuesday, they sat and ordered drinks and food. At some point, M.B. stepped away to take a phone call. She returned to the table to find the food gone, and that the defendant had paid the bill and left the restaurant. M.B. texted the defendant that she was heading to another store and began to walk through the parking lot outside Ruby Tuesday. In the parking lot the defendant approached M.B. in his car and the two got into an argument regarding M.B. taking the phone call during their meeting. As the argument intensified, the defendant forced M.B. against her will into the back of the car. M.B. tried to escape but the defendant stopped her by grabbing her and ultimately binding her hands with zip ties. He then drove her from Maryland to a residence in Southeast, Washington, D.C.

Once they arrived in Washington D.C., M.B. again tried to escape by running away from the defendant and calling out for help. He caught her and forced her onto the front steps of the home. There, the defendant used his hands and arm to apply pressure to M.B.'s throat, making it difficult for her to breathe. The defendant only released M.B. when she agreed that she would not scream or run. The defendant then led M.B. into the home to a bedroom on the second floor. While inside the bedroom, the defendant forcibly penetrated M.B.'s mouth with his penis against her will. M.B. tried to get away but the defendant held her still, on her knees, while he forced her to perform oral sex. He then made M.B. lay on the bed where he forcibly penetrated her vagina with his penis against her will. During these events, the defendant placed his firearm on a table, which was visible to M.B. during the attack. After the sexual assaults and following reported pleas with the defendant regarding an urgent work assignment, M.B. convinced the defendant to drive M.B. back to Maryland. The defendant agreed on the condition that she would return to him later that night.

As the defendant drove M.B. from Washington, D.C. to Prince George's County, Maryland, M.B. convinced the defendant to stop at a 7-11 in Maryland so that she could make a purchase. M.B. tried to escape when she was in the 7-11 but the defendant again prevented her from leaving. He followed her to the 7-11 and then again tried to force her back into his car. Surveillance footage from the 7-11 captured the defendant attempting to push M.B. into his

vehicle, and her escape. When M.B. tried to escape on foot, the defendant chased her down and ultimately caught her. He assaulted her, breaking her front tooth in half. Ultimately, M.B. escaped and the defendant fled in his car.

M.B. was treated by Prince George's County Emergency Medical Services on scene and later went to a hospital where she underwent emergency medical treatment and received a Sexual Assault Nurse Examination (SANE). M.B. had numerous injuries including,

(1) lacerations and bruising to her wrists

(2) bruising to her legs, buttocks, hip, chest, and arms

(3) bruising and lacerations to her throat

(4) petechia – an indication of bleeding under the skin – to her throat and mouth

(5) a broken tooth and bruising and bleeding of her lip

(6) a laceration to the perineal region of her genitals.

Particularly, the defendant applying pressure to the neck of M.B. outside of the D.C. residence until she "saw stars" caused a substantial risk of death, as it prevented the regular flow of blood and oxygen in her body. M.B. ultimately needed a root canal and crown put on. Exhibit A at 19; Attachment C.

[redacted]

The defendant also used sexual abuse, particularly anal penetration and strangulation, to punish M.B. for perceived slights against him. Attachment B at 1. While there were instances where the defendant applied pressure to M.B.'s neck consensually, there were instances where this

conduct was not consensual. On certain occasions, the defendant applied so much pressure to M.B.'s neck that her neck was sore afterwards and had marks on it. Attachment B at 2.

On one prior occasion approximately a week prior to the above-described kidnapping, when M.B. tried to retrieve her belongings, M.B. entered the defendant's vehicle just to talk. He started driving and drove them to a hotel. The defendant made M.B. go up to a hotel room where he zip tied the door lock and the knob together. M.B. felt pressured to engage in sexual acts with the defendant. The defendant anally penetrated M.B. with his penis, and when M.B. told the defendant to stop, he continued to anally penetrate her. When M.B. tried to leave, the defendant choked her. The defendant ultimately agreed to drive M.B. home and M.B. noticed the zip ties on the door and additional zip ties in the defendant's bag. Attachment B at 2-3.

## II. SENTENCING GUIDELINES

The government agrees with the estimated sentencing guidelines set forth in the Draft Presentence Report. With respect to the federal offenses, the defendant's final offense level is 38, his Criminal History Category is I and that an appropriate estimated guidelines range is 235 to 293 months. While the government agrees that the correct guidelines range is 235 to 293 months, in accordance with the plea agreement in this matter, the government is seeking a sentence of 210 months.

## III. GOVERNMENT'S RECOMMENDATION

### A. Application of the Federal Sentencing Guidelines

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving

both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

B. <u>Basis for the Government's Recommendation</u>

The government submits that the following terms are appropriate and warranted in the present case: 210 months of imprisonment followed by five years of supervised release. The government does not make this recommendation lightly. The defendant's conduct is not an isolated incident; rather it is part of a long pattern of physical and sexual abuse committed by the defendant against M.B. As discussed herein, the 18 U.S.C. § 3553(a) factors each support a Guidelines-compliant sentence of 210 months of incarceration.

*1. The Nature and Circumstances of the Offense*

The defendant's crimes warrant the sentence. His conduct was horrific and demonstrated an utter lack of humanity towards someone that he was once in a romantic relationship with. He was violent with her, punishing, and forced her to fit his twisted fantasy, in which he could demand sex and her return home later that night. The defendant came to the meeting with M.B. with zip ties, an indication that this was a premeditated attack. When the defendant believed that M.B. was speaking to another man, he became enraged and forced her into his vehicle, binding her hands with zip ties. He violently forced her inside his grandmother's house after choking her. After he forced M.B. inside the house, the defendant raped her. But his criminal conduct was still not done. When M.B. designed a ruse to try to escape the defendant, he drove M.B. to a 7-Eleven. Even in the parking lot,

he had every intention of trying to maintain full control over M.B., and ultimately assaulted her and broke one of her teeth. The defendant's conduct here is particularly disturbing because it was not a single instance of violence in the heat of the moment. Rather, it was a continual set of violent acts with sustained intensity driven largely by the defendant's anger towards M.B.

Several studies have shown the significant negative impact of sexual assault on victims:

> "Adulthood sexual trauma is associated with short-term and long-term psychological consequences. Short-term effects include shock, fear, anxiety, confusion, and withdrawal. Many survivors experience a reduction in symptoms within a few months, whereas some women experience distress for years. Long-term outcomes include PTSD, depression, eating disorders, sexual dysfunction, alcohol and illicit drug use, nonfatal suicidal behavior and suicidal threats, physical symptoms in the absence of medical conditions, and severe preoccupations with physical appearances. Risks of developing mental health problems are related to assault severity, other negative life experiences, maladaptive beliefs, and perceptions of lack of control."

Nicole P. Yuan, Mary P. Koss & Mirto Stone, *The Psychological Consequences of Sexual Trauma* (VAWnet: Nat'l Online Res. Ctr. on Violence Against Women, Mar. 2006). The defendant's conduct in this case will have long-lasting repercussions for M.B. in terms of her mental and physical health. Therefore, a sentence of 210 months' incarceration is appropriate.

### 2. *The History and Characteristics of the Defendant*

The government's recommended sentence is appropriate in light of the defendant's history and characteristics. The defendant, based on his own reporting, came from a loving family. While there was some instability in terms of constantly moving houses and alcohol abuse at a young age, these are not factors that mitigate the defendant's conduct in the instant matter. While the defendant lacks a criminal history, he engaged in violent behavior towards M.B. on several occasions, including choking M.B. and using anal sex to punish M.B. A week prior to the charged conduct, the defendant drove M.B. to a hotel against her will, pressured her into sex, and choked her. The fact that this conduct was not reported to law enforcement is not unusual and is consistent with widely reported data that domestic violence and sexual assault incidents are underreported to law enforcement. In fact, only half of all instances of domestic violence are reported to law enforcement. *Nonfatal Domestic Violence, 2003-2012*, Jennifer L. Truman and Rachel E. Morgan (Bureau of Justice Statistics, Department of Justice). The defendant's criminal conduct, when placed in the

context of his prior abuse of M.B., shows that he poses a significant danger to M.B. and any future romantic partner.

Additionally, the defendant's conduct during this case indicates that he would not be amenable to or compliant with court-ordered supervision and conditions. As a general matter, defendants who are remorseful and accept responsibility for their conduct are more likely to be amenable to post-incarceration supervision and treatment. In the instant matter, following the defendant's guilty plea, he moved to withdraw it. During the hearing for the defendant to withdraw his plea, the defendant testified in contradiction of the sworn statement of offense that he did not sexually assault M.B. The defendant's attempt to withdraw his guilty plea and desire to minimize his criminal conduct are evidence that he is not remorseful for his conduct and does not truly appreciate the harm he caused. Therefore, the factor of the defendant's history and characteristics weighs in favor of a sentence of 210 months' incarceration.

*3. Punishment, Deterrence, Protection, and Correction*

A sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The government's recommended sentence is necessary in the context of this particular case. The defendant's conduct inflicted harm on M.B., despite their romantic history. The testing conducted during the psychosexual evaluation largely showed that the defendant has an average risk of reoffense, including the Static 99-R and the Stable-2007. This is particularly concerning when considering the defendant's danger to the community. The other factor present in this case is that the defendant engaged in physical and sexual abuse of the victim over an extended period of time leading up to the charged conduct and did so with impunity. The prolonged nature of the defendant's

abuse of the victim indicates he poses a significant danger to the community, therefore, he should be given a sentence of 210 months incarceration.

*4. Available Sentences and the Need to Avoid Unwarranted Disparities*

Section 3553(a)(6) directs courts to consider the need to avoid *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010)).

The U.S. Sentencing Commission's Judicial Sentencing Information shows that from 2019-2023 there were 4 defendants whose primary guidelines were §2A4.1, with a final offense level of 38 and a criminal history category of I[1]. For these four defendants the median length of imprisonment was 215 months, which is above the sentence requested by the government. Additionally, there is a comparator case within this district, *United States v. Blue*, 21-cr-221(CJN), which also involved a knifepoint kidnapping of the victim. In *Blue*, the defendant and a co-conspirator kidnapped the victim on her way home from work, drove her to a bank to withdraw money from an ATM using her bank card, and repeatedly sexually assaulted her before dropping her off in an alleyway. The court sentenced Blue to 40 years' incarceration following his conviction at trial. That sentence far exceeds the government's requested sentence in the instant matter. Therefore, a sentence of 210 months' incarceration is reasonable and would not create an unwarranted sentencing disparity.

*5. Restitution*

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

---

[1] This is after excluding defendants who received a §5K1.1 substantial acceptance departure.

Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by

nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry"). Both statutes provide that, in the case of an offense resulting in the loss of property, the defendant pay an amount equal to the greater of the value of the property on the date of the loss or the date of sentencing. 18 U.S.C. §§ 3663(b)(1), 3663A(b)(1).

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or offenses "in which an identifiable victim . . . has suffered a physical injury or pecuniary loss," *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

Restitution ordered under Section 3663 or Section 3663A "shall be issued and enforced in accordance with section 3664." 18 U.S.C. §§ 3663(d); 3663A(d). Because this case involves the related criminal conduct of two defendants, the Court has discretion to make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant. 18 U.S.C. § 3664(h).

Here, restitution applies under both 18 U.S.C. §§ 3663 and 3663A.[4] The government has spoken with M.B. regarding restitution in this matter and she has indicated she is seeking restitution for belongings in a storage locker that belonged to M.B. One of the reasons M.B. arranged to meet

with the defendant on the date of the instant offense was to retrieve the key for the storage locker. She was unable to retrieve the key due to the defendant's conduct. The defendant possessed the only key to the locker. When M.B. attempted to obtain another key to access the storage locker, her belongings were missing. At the time of this filing, the government does not have an estimate of the cost of the belongings M.B. lost. When the government receives that information, it will provide it to the Court and the defendant.

## IV. SUMMARY OF THE GOVERNMENT'S RECOMMENDED SENTENCE

To conclude, the government recommends a sentence of 210 months of incarceration followed by 60 months of supervised release.

## V. CONCLUSION

WHEREFORE, for all of the reasons discussed above, the government recommends that the Court sentence the defendant as discussed herein.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

/s/Janani Iyengar
Janani Iyengar
Assistant United States Attorney
NY Bar No. 5225990
U.S. Attorney's Office, District of Columbia
202-252-7760
Janani.iyengar@usdoj.gov